35 C.C.P.A.(Patents)

## Application of FREY et al.

### Patent Appeal No. 5421.

Court of Customs and Patent Appeals.

March 2, 1948.

J. Paul Jones, of Washington, D. C. (T. B. Hudson, of Washington, D. C., of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (J. Schimmel, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting claims 2, 5, and 11 to 18, inclusive, of appellants' application for a patent on a process for alkylating hydrocarbons to render them "suitable for use in an aviation or premium motor fuel." There are no allowed claims. The rejection was based upon various grounds hereinafter recited.

It appears that appellants' application was filed February 14, 1942, as a continuation in part of an application, Serial No. 355,529, filed September 5, 1940, which, on September 22, 1942, matured into patent No. 2,296,512, and which was a division of another application, Serial No. 87,790, filed June 27, 1936, that, on February 25, 1941, matured into patent No. 2,233,363. The drawing of the application consists of a single figure which is identical with figure 2 of the earlier applications, as is its description in the specification. All the claims are process claims.

It further appears that in filing the involved application appellants sought an interference with a patent No. 2,238,802, issued April 15, 1941, upon an application filed November 6, 1939, to Joe A. Altshuler et al., claim No. 1 of the patent being copied and made claim No. 1 of the application. The interference was duly declared, but on May 29, 1943, appellants (their assignee consenting) filed notice of abandonment of the contest in the Patent Office. On June 8, 1943, the Examiner of Interferences dissolved the interference, and ex parte prosecution was thereafter resumed, portions of the specification and certain of the claims being cancelled as hereinafter related.

The claims are divisible into two groups, the first embracing claims Nos. 2, 5, 13, 14, 17, and 18; the second, Nos. 11, 12, 15, and 16. Inasmuch as the respective groups require separate consideration, we shall first take up those of group 1, of which claim 2 is representative. It reads:

"2. In a process of alkylation in which olefinic and iso-paraffinic hydrocarbons are reacted in the presence of a condensation catalyst while flowing in a circuit comprising a reaction zone into which reaction zone the iso-paraffinic and olefinic hydrocarbons are introduced in a feed in which the molar quantity of the iso-paraffinic hydrocarbon is greater than the molar quantity of the olefinic hydrocarbon, *the improvement which comprises increasing the molar ratio of the iso-paraffinic hydrocarbon to the olefinic hydrocarbon in the reaction zone in excess of one hundred to one by increasing the rate of flow of the materials in the circuit such that they traverse said circuit in a time correlated with the amounts of said introduced iso-paraffinic and olefinic hydrocarbons to maintain said molar ratio in excess of 100:1.*" (Italics ours.)

It will be observed that almost half of the context of the claim constitutes a preamble. The improvement claimed is embraced in the portion which we have italicized.

There is no contention that any one of this group of claims has any limitation which differentiates it patentably from the other claims of the group. In other words, all the claims of this group stand or fall together. So, there is no necessity for a separate analysis of them.

All the claims in group 1 were rejected (1) as lacking adequate support in the disclosure of the application; (2) as not defining the claimed invention sufficiently to meet the requirements of Section 4888, R. S., 35 U.S.C.A. § 33, and (3) as being unpatentable over the issue of the interference hereinbefore alluded to; that is, over claim 1 of the Altshuler et al. patent and the disclosure of that patent, which is the only reference cited in connection with the group.

The general idea expressed by appellants is that of producing saturated hydrocarbons of higher molecular weight by catalytic

synthesis. In his statement following the appeal to the board, the examiner said:

"The catalysts disclosed by applicants are aluminum chloride combined with lithium, sodium, calcium, or potassium chloride and the corresponding double compounds in which chlorine is replaced by bromine, zinc chloride, zinc bromide, hydrous alumina, and hydrous alumina deposited on or combined with hydrous silica. The catalyst is used in granular form or disposed on an inert granular support."

The specification teaches that the saturated oils are produced by a mixture of paraffins and olefins subjected to catalyst action, the ratio of olefins to paraffins being very low. During the course of the reaction and prior to contact with the catalyst olefin is added in small proportions, each addition of it being consumed before another addition is made. In this way the concentration of the olefin reactant is maintained at a low value and the paraffin reactant at a high value. It is said:

"* * * By the practice of our invention it is practical to have the ratio of isoparaffins to olefins in the presence of the condensation catalyst in excess of 100:1, and practical operation can be obtained in accordance with our invention with this ratio as high as about 200:1 or more, i. e. an olefin concentration as low as 0.5%, as previously mentioned."

The drawing of the application is quite clear and the operation is easily understood when the specification is read in connection with it. The olefins and paraffins enter the process together through a pipe from which they are forced by a pump through another pipe into a reaction chamber. There the hydrocarbons (the paraffins and olefins) are carried into contact with the catalyst. From the chamber the reacted material is discharged into a conduit and divided into two streams. One of the streams flows through a valve into a pipe from which it is forced by a pump through another valve back into the entrance pipe to be recycled. The other stream flows through a valve into a pipe through which it passes into a separator in which the hydrocarbons of higher molecular weight are separated from those of lighter weight and discharged through a conduit controlled by a valve. It is further recited that a certain recycling backwardly from the reaction chamber may be desirable or necessary, with only a minimum amount of the reacted hydrocarbons passing directly from the reaction chamber, in which event the valve in the line of the second stream referred to may be set at any desired partially closed position. It is said that by control of the several valves referred to, the flow into the separator and the flow for recycling can be readily controlled and regulated.

It appears that claim 2, supra, and claim 5 were a part of the application as filed, and the brief for appellants lays great stress upon that fact in connection with the matter of disclosure, citing our decision in the cases of Buchanan v. Burrage, Jr., 41 F.2d 98, 17 C.C.P.A., Patents, 1194, and In re Burke et al., 93 F.2d 50, 25 C.C.P.A., Patents, 795, and several decisions of the Board of Appeals of the Patent Office. The Solicitor for the Patent Office concedes that an original claim is considered as part of the disclosure, as set forth in Re Mason, Deceased, 94 F.2d 220, 25 C.C. P.A., Patents, 873, but adds, "However, that fact, in and of itself, is not conclusive upon the question of whether the claim is allowable, as pointed out in Re Ware, 129 F.2d 552, 29 C.C.P.A., Patents, 1106, and In re Moore, 155 F.2d 379, 33 C.C.P.A., Patents, 1083."

It is contended on behalf of appellants not only that the disclosures of the specification of their application supports the first group of claims, but that claims 2 and 5, as original claims, were a part of the original disclosure and, therefore, support themselves, and also support claims 13, 14, 17, and 18.

The examiner's discussion relating to inadequate disclosure is as follows:

"* * * After the motion period in the interference proceeding, applicants abandoned the contest and upon resumption of ex parte prosecution, applicants cancelled from their specification all reference to specific times for the materials to traverse the circuit comprising the reaction zone. They also cancelled all claims which mentioned any specific time periods. Claim 1,

for example, which constituted the sole count of the interference, called for the traversal of the circuit of the material in less than 70 seconds.

"Appealed claims 2, 5 and 14 differ in the statement of the time element for traversal of the circuit over the count of the interference which calls for a time 'less than 70 seconds' by calling for 'a time correlated with the amounts of said introduced iso-paraffinic and olefinic hydrocarbons to maintain said molar ratio in excess of 100:1.' In view of the cancellation from the specification of all reference to specific times for traversal of the circuit by the materials, it has been held by the examiner that claims 2, 5 and 14 are inadequately supported. These claims have accordingly been rejected as inadequately supported by the disclosure."

In the decision of the board it is said:

"* * * The [copied] claim contained a time limit in which the materials flow in the circuit, which was stated to be less than seventy seconds. This limitation has also been eliminated from the specification of this case where it occurred in Example 1 as sixty-seven seconds, and in Example 2 as sixty-nine seconds. Thus, specific reference to time limit has been cancelled from the present specification. It will be noted that the claims, where they refer to a time period, correlate the time in which the materials traverse the circuit in terms of rate of flow with the amounts of the isoparaffin and olefin introduced.

"Claims 2, 5 and 14, which bring out the correlation of the rate of flow with the amounts of introduced materials, stand rejected as being inadequately supported by the disclosure in view of the cancellation from the specification of all reference to the specific time for traversal of the circuit by the materials. Appellants controvert this rejection by pointing out that the cancellation of specific times in pages 8 and 9 of the specification was made as a result of a discovery of an inadvertent error in calculating such times and since calculation errors would affect the specific time of recirculation, but not the ratio of isoparaffin to olefin, a specific numerical time is not and cannot per se be critical.

While this may be true as a broad proposition, it seems to us that in specific examples involving percentages of reactants, temperatures, pressures and other essential factors involved in the process, the time of traversal of the materials in the circuit should be given in connection with other features in order to disclose a completely operative process. The claims under consideration merely state that the rate of flow of the materials is such that they traverse the circuit 'in a time' correlated with the amounts of introduced isoparaffins and olefins to maintain the ratio called for in the claims. When this correlation in terms of time is sought to be interpreted in the light of the disclosure, it cannot be found. We, therefore, agree with the Examiner that the disclosure, in so far as it supports the limitation in claims 2, 5 and 14 with respect to the time involved, is inadequate."

So far as we are advised, it long has been the practice of the tribunals of the Patent Office to treat subject matter recited in a claim embraced in an application as originally filed as being itself a part of the disclosure, even though it may not be defined in the specification, and that practice has been sustained by this court in numerous decisions.

Original claim 2, supra, instead of reciting a flow of materials within a time limit expressed in seconds, recites "a time correlated with the amounts of said introduced iso-paraffinic and olefinic hydrocarbons to maintain said molar ratio in excess of 100:1," and original claim 5 recites the same.

Certainly the quoted clause is a disclosure of itself and the claims being original claims they may be looked to for disclosure in considering the subsequently added claims. Also, it may be said that so far as disclosure per se is concerned, the specification itself seems to support the particular clause of the claim which we are considering, but mere naked disclosure does not render the subject matter expressed in a clause patentable. The important holding of the board in this case is to the effect that a completely operative process is not disclosed because no units

or terms of time in which the materials may flow through the circuit are given.

■ It is contended that appellants did make disclosure sufficient to define an operative process in the specification, particularly in two examples therein set forth in which matters relating to circulation and recirculation were discussed, along with statements as to temperatures, fractionation, and analysis of hydrocarbon material after its passage to a separator, and in which tables were given showing the weight, value, density, etc., of various fractions. It was from the examples that specifically stated units of time expressing the rate of flow were cancelled, but it is contended that sufficient remains to constitute adequate disclosure.

We have made careful study of the examples given as well as of other portions of the specification quoted and referred to in appellants' brief in the light of the arguments of counsel for appellants and those of the Solicitor for the Patent Office. It appears obvious that, as stated in substance in the brief of the latter, the alleged novelty in the process here involved lies in the variation of the rate of flow of the reactant materials in the circuit, and it seems to us that, in order to enable those skilled in the art to understand and practice the invention, the rate of flow, which necessarily involves a time element, should be stated in units or terms customarily used in stating time.

We are of opinion that the first ground of rejection—inadequate support—and the second ground—indefiniteness—are somewhat related. Concerning the second ground the examiner said:

"Claims 2, 5 and 14 [the ground of rejection being applied also to claims 13, 17, and 18] have further been rejected as failing to clearly define the invention in accordance with the requirements of Sec. 4888, R.S. The time element is of the essence of the alleged invention and must therefore be clearly and distinctly defined whereas the foregoing claims define the time very indefinitely and in terms of the desired result and therefore do not properly point out the invention as required by the noted statute."

In affirming the examiner's holding respecting indefiniteness, the board said:

"These claims stand further rejected as failing to clearly define the invention since the time element is indefinitely stated in terms of the desired result. Claim 2 defines the improvement as an increase in the molar ratio of isoparaffin to olefin in excess of 100 to 1 by increasing the rate of flow of the materials in the circuit such that they traverse said circuit in a time correlated with the amounts of materials introduced to maintain said ratio. Claim 5 is similarly drawn, as is also claim 14, which is somewhat differently worded in that the molar ratio is said to be established and maintained by establishing and maintaining the rate of flow of the materials such that they traverse the circuit in a time correlated with the amounts of the introduced hydrocarbons to maintain the desired molar ratio. It appears to us that the new result alleged for appellants' process is stated in terms which merely point out the result desired rather than in terms of a step or steps which define an invention. In re Caunt, 81 F.2d 405, 23 C.C.P.A., Patents, 855, 1936 C.D. 205; In re Duggan, 124 F.2d 215, 29 C.C.P.A., Patents, 765, 1942 C.D. 209 and In re Stack, 87 F.2d 210, 24 C.C.P.A., Patents, 836, 1937 C.D. 230."

An analysis of the subject matter embraced in the claimed improvement shows that appellants seek patent for a process whereby, in the reaction zone, the molar ratio of iso-paraffinic hydrocarbon to olefinic hydrocarbon is in excess of 100 to 1. That is the result. It is so stated in the beginning of the material part of the claim. The method of obtaining the result is to increase the rate of flow of the materials in the circuit. The necessary rate of flow to accomplish the result is not stated in units of time, such as seconds, minutes, hours, days, etc., but as "in a time correlated with the amounts of said introduced iso-paraffinic and olefinic hydrocarbons to maintain said molar ratio in excess of 100:1." As we view it, this time clause can mean nothing more than that those skilled in the art by experimenting might learn something.

We are not convinced that the board erred in sustaining the examiner's rejection of the first group of claims—that is, claims 2, 5, 13, 14, 17, and 18—on the grounds of (1) lack of disclosure of an operative process and (2) for indefiniteness.

Since rejection upon those grounds is conclusive of the case, so far as this group of claims is concerned, it is unnecessary to here pass upon the rejection based upon other grounds.

Of the second group comprising claims 11, 12, 15, and 16, we quote 11 as representative:

"11. A process of producing paraffins boiling in the motor fuel range from a lower-boiling isoparaffin and a lower-boiling olefin, which comprises alkylating a low-boiling isoparaffin with an olefin by contacting an admixture of the olefin and the isoparaffin with a condensation catalyst under alkylating conditions, and maintaining the olefin concentration in the paraffinic reactants not greater than about 0.5 per cent at the point where the olefin initially contacts the condensation catalyst."

Claims 15 and 16 define the process as being continuous, and claim 12, like claim 16, defines the ratio of isoparaffin to olefin as being "at least about 100:1" at the point where the olefin initially contacts the condensation catalyst.

In a decision rendered January 20, 1944, before claims 15 and 16 had been introduced into the application, the examiner rejected claims 11 and 12 (along with two claims numbered 4 and 10) first, "for double patenting over claim 5 of [appellants'] patent No. 2,233,363," and, second, as being "so broad as to be met" by patent No. 2,-169,809, issued to Jacque C. Morrell, August 15, 1939, upon an application filed May 3, 1939, which purported to be a continuation in part of an application, Serial No. 32,638, filed July 22, 1935. The references cited in the rejection of this group of claims are:

Morrell, 2,169,809, August 15, 1939.
Frey et al., 2,233,363, February 25, 1941.
Frey et al., 2,296,512, September 22, 1942.

The rejection on both grounds was repeated by the examiner, after proceedings hereinafter related, in a decision of October 19, 1944, and appeal was taken to the Board of Appeals which expressly affirmed the decision of the examiner as to the rejection on prior art but made no reference to double patenting.

The instant appeal to this court followed.

Concerning the question of double patenting an issue has been raised before us but before discussing it we take up the rejection based on the Morrell patent.

As may be seen from claim 11, supra, the process comprises two steps, the first being that of carrying a mixture of lower-boiling olefin and lower-boiling isoparaffin into contact with a condensation catalyst under alkylating conditions and, the second, that of maintaining the olefin concentration at an amount "not greater than about 0.5 per cent" at the point where the olefin initially contacts the catalyst. In claim 12 the amount is defined as "at least about 100:1"—that is, as we understand it, 100 parts of isoparaffin to 1 part of olefin. Claims 15 and 16 are duplicates of 11 and 12, respectively, except that 15 and 16 designate the process as continuous.

That the Morrell patent discloses an alkylation process wherein lower-boiling isoparaffin is brought in contact with an olefin in the presence of a condensation catalyst, which corresponds to the first step of the claims now under discussion does not seem to be questioned by appellants, but it is contended on their behalf that the second step is not met by the Morrell disclosure.

It may be said at this point that the examiner gave the Morrell patent an effective date of July 22, 1935, for disclosure of the subject matter of the claims, this being the date upon which what may be designated as the Morrell parent application was filed, and appellants seem to have been accorded an effective date of June 27, 1936, which was the filing date of their parent application.

The Morrell parent application as filed is included in the record before us, and it is contended on behalf of appellants that there are "many differences and discrepancies" affecting the question of patent-

578

ability between the earlier disclosure and that of the patent.

The specification of the patent teaches that in a "simple type of batch operation" isobutane (an isoparaffin) and sulfuric acid (Morrell's catalyst) are heated to the proper temperature and alkylation is affected "by the gradual introduction of an olefin, such as, for example, isobutylene, under the surface of the liquid which may be mechanically stirred to effect intimate contact between catalyst and reacting compounds * * *." It also teaches that "It is preferable to maintain an excess of paraffin at all times in the reaction zone * * *."

In an illustrative example it is stated "50 parts of isobutane was alkylated by an approximately equal volume of n-butylene * * * The butylene was added at such a rate that it was substantially completely absorbed * * *."

Evidently referring to the several quoted recitations from the specification the examiner said:

"In the batch operation of the specific example of Morrell, the olefins are introduced in small increments over a substantial period of time and therefore the isoparaffin to olefin ratio is very high, clearly in excess of 100 to 1."

It seems evident that this statement on the part of the examiner represented his construction, or interpretation, of the teachings of the Morrell disclosure, because as a matter of fact Morrell did not state in either of his specifications that he introduced olefins "in small increments over a substantial period of time," nor did he state any percentage of olefin or any ratio of isoparaffin to olefin. His specification does teach the "gradual introduction of an olefin" and the adding of it "at such a rate that it was substantially completely absorbed."

When the controversy was carried before the board by appeal the presentation made in the brief for appellants upon this point was replied to by the examiner, acting under Patent Office rule 137, 35 U.S.C.A. Appendix. In the course of his reply he said:

"In speaking of the specific example of operation of the Morrell patent at the bottom of page 9 and the top of page 10 of their brief, applicants interpret the word 'absorbed' as meaning physical solution. This is unwarranted. The examiner is of the opinion that what is meant by 'absorbed' is 'chemical reaction.' The olefin is absorbed due to disappearance thereof because of reaction. Alkylation conditions are present and the reaction is generally established as being instantaneous when the olefin is added to an isobutane-acid solution maintained under alkylation conditions of operation. Since all the paraffin is present and the olefin is introduced portionwise or gradually, then the paraffin to olefin ratio is obviously very high."

In the course of its decision the board said:

"The patent to Morrell discloses an alkylation process wherein alkylation is effected by the gradual introduction of olefin. This process would maintain a low olefin concentration which, the Examiner considers, would produce over a substantial period of time an isoparaffin to olefin ratio easily in excess of 100 to 1 at the point where the olefin initially contacts the catalyst. Appellants point out that certain portions of the Morrell patent specification were added at a date which is too late to anticipate the appealed claims, but it is noted that the earliest Morrell application filed in 1935 has a disclosure to the effect that alkylation is effected by the gradual introduction of an olefin which is added at such a rate that it is substantially completely absorbed, or, as the Examiner interprets the term "absorbed", reacted with [, to ?] which interpretation we agree. The earlier application also points out that 85 parts by weight of hydrocarbon product produced was paraffinic in nature. As above indicated, the claims are broadly drawn and we consider that they are amply met by Morrell who maintains his olefin concentration in the paraffinic reactants of the order defined in the claims, as the Examiner points out. The continuous process defined in claims 15 and 16 is obviously unpatentable since it calls for no more than continuously maintaining the molecular ratio at least of 100 to 1. We consider

the Morrell patent a proper reference and the rejection of claims 11, 12, 15 and 16 thereon will be sustained."

In the brief before us it is asserted on behalf of appellants:

"Although not stated by Morrell, the isobutane was presumably a liquid, although no pressure is recited and the reaction temperature of "between 15° and 20° C.' is well *above* the normal boiling temperature of isobutane (-10°C.). In any event, the normal boiling point of n-butylene (-5°C.) is *higher* than that of isobutane and, in view of the well known mutual solubility and complete miscibility of hydrocarbons, a rate of addition of n-butylene to isobutane such 'that it was substantially completely absorbed' [The Examiner took the stand that 'absorbed' meant 'chemical reaction,' which is certainly not so stated by Morrell, and is not the *inherent* meaning of Morrell's language.] would *not inherently result in a 'very high'* ratio of isoparaffin to olefin 'clearly in excess of 100:1,' *nor* in introduction of olefin 'in small increments.' It is well established that an *inherent* result is not one which *might* be obtained but, instead, is one which *must inevitably* be obtained." (Italics quoted.)

Another contention on behalf of appellants is that Morrell's early application failed to disclose the maintaining of an excess of paraffin in the reaction zone at all times. (This is disclosed as being "preferable" in the patent but, as we understand it, the tribunals of the Patent Office were of opinion that in order to meet appellants on that point it was necessary that it should have been disclosed also in the early application.) The brief of the Solicitor for the Patent Office discusses this contention (omitting record page references) as follows:

"Although it is true as appellants state that the early Morrell application failed to disclose the concept of maintaining an excess of paraffin at all times * * *, it is also true, as stated by the Board of Appeals, that, since the earlier Morrell application did disclose that "alkylation is effected by the gradual introduction of an olefin at such a rate that it is substantially completely absorbed" * * *, the broad subject matter of the claim is amply met

by Morrell. In arriving at this conclusion it is believed to be apparent that the Board considered that in an operation in which one material is added 'gradually' to another it inherently results that the material being incorporated is added in steps or degrees or in increments of the total quantity to be added. This is a necessary conclusion in order to give effect to the teaching that the olefin is introduced gradually."

It is also contended on behalf of appellants that neither of the Morrell specifications makes any reference at any point to any feature of olefin concentration or to its control at any level. The brief (omitting record page references) asserts:

"In fact, the very general reference in the patent to maintaining 'an excess of paraffin at all times' * * * is conspicuous by its complete absence from this earlier disclosure, but the statement that 'the best products from the standpoint of motor fuel usually are produced by the condensation of equimolar quantities,' * * * is common to *both* disclosures. At one place it is suggested that the paraffin and olefin be mixed and the catalyst added * * *. The single example of this earlier application is concerned with the reaction of *normal* butane with propylene at -25°C.; further emphasis of *low temperature* as 'the essential feature.'" (Italics quoted.)

In the brief of the Solicitor for the Patent Office it is conceded that the allegation to the effect that there is nothing stated in either of Morrell's disclosures about olefin concentration is "technically" true, but it is argued that "the gradual introduction taught by Morrell inherently means that the olefin is in low concentration as compared to the paraffin concentration." Also, it is urged, in effect, that since nothing critical is disclosed for the particular per cent of olefin defined in the appealed claims (the specification states that olefin concentrations "below 20%, and preferably below 10%," are maintained) the limitation in the claims respecting olefin concentration is of no patentable significance.

From the facts so far recited it seems obvious to us that the teachings of the Morrell specifications do not meet appealed claims 11, 12, 15, and 16 in any clearly defined respect. We apprehend that if

Morrell had sought to obtain a patent upon claims reading just as those claims read, based upon either his early application or his later one, or upon the two taken together, he would have been denied for lack of sufficient disclosure to support those particular claims. It is not meant to imply that a reference in order to be valid always must be in such form that it would support claims rejected upon it, but it is sometimes helpful in trying to reach a correct conclusion to apply such a test.

A careful reading of Morrell's specification fails to disclose any specific statement as to the respective percentages of isoparaffin and olefin. There is nothing which goes so far even as to say that the olefin content, or concentration, is low, and a low percentage of olefin surely is a vital feature of the appealed claims.

It is true that the patent (but not the parent application) of Morrell states (and this is not in the single example) that "It is preferable to maintain an excess of paraffin at all times in the reaction zone as in the method of operation above described. This tends to minimize undesirable polymerization reactions." This statement, assuming that it properly may be looked to although not in the early specification, lacks much of being a teaching that the olefin percentage is low.

So far as the decisions of the tribunals of the Patent Office are concerned, the only teaching of Morrell from which any deduction is made by them relative to the respective proportions of isoparaffin and olefin appears to be that of the "gradual introduction" of the olefin, or of it being "added at such a rate that it was substantially completely absorbed."

We regard this as being too strained an interpretation of the quoted phraseology, and, in our opinion, claims 11, 12, 15, and 16 should be allowed so far as the prior art cited against them is concerned.

We now revert to the issue relating to the matter of double patenting.

As has been stated, the examiner in a decision rendered January 20, 1944, before claims 15 and 16 had been introduced into the case, rejected claims 11 and 12 and also claims numbered 4 and 10, then in the case,

not only as being met by the Morrell patent, but "for double patenting over claim 5 of [appellants'] patent No. 2,233,363."

In response to that action appellants cancelled claims numbered 4 and 10 "without prejudice," requested reconsideration of claims 11 and 12, and added claims 15 and 16, stating them to be similar to claims 11 and 12 but somewhat more limited because restricted to continuous process. In the "Remarks" accompanying the request and amendment, the examiner's holding as to both grounds were challenged and arguments presented. The examiner adhered to his position and in a decision rendered October 19, 1944, which he declared to be final, stated, "Claims 11, 12, 15 and 16 are rejected on both grounds as against claims 11 and 12 in the previous Office action."

Following that decision of the examiner, declared to be final, appellants, on February 5, 1945, proposed more amendments. None of the proposed amendments related to claims 11, 12, 15, and 16, but in the "Remarks" accompanying the proposal the two grounds of rejection which had been applied to them—prior art and double patenting—were again challenged and argued. Certain affidavits were also presented in one of which the matter of double patenting was discussed along with the other ground of rejection.

In an Office action of March 16, 1945, the examiner stated that the proposed amendment and affidavits "have not been entered," and gave his reasons for refusing their entry, but he also took occasion to reiterate the rejection of claims 11, 12, 15, and 16 on the ground of double patenting.

On April 3, 1945, appellants took appeal to the Board of Appeals, expressly stating that it was from the examiner's decision of October 19, 1944—his final decision. In one of the reasons of appeal error was alleged on the part of the examiner in rejecting the claims on the ground of double patenting.

The examiner's statement following the appeal to the board, provided by rule 135 of the Patent Office rules, was filed June 21, 1945. In this statement no reference was made, directly or indirectly, to the rejection on the ground of double patenting.

The brief for appellants was filed with the board May 13, 1946. A copy of it was made part of the record before us. No reference of any character was therein made to the question of double patenting.

The examiner made a reply to appellants' brief on July 11, 1946, in which no reference was made to the question of double patenting.

The decision of the board was rendered August 5, 1946. It made no reference to the question of double patenting.

Appellants took the instant appeal to this court September 19, 1946, and in one of the reasons of appeal alleged that the board "erred in sustaining the Examiner's rejection of claims 11, 12, 15, and 16 for double patenting over claim 5 of applicants' patent 2,233, 363," but the brief for appellants filed in this court October 1, 1947, made no reference to the question. The brief of the Solicitor for the Patent Office, filed December 1, 1947, however, did take note of the matter and discussed it.

The case was assigned for argument before us on January 12, 1948. On January 7, 1948, appellants filed a motion to strike from the record the reason of appeal relating to double patenting, and to strike from the brief of the Solicitor for the Patent Office those portions which relate to that question. The motion was taken with the case, supplemental briefs upon it being subsequently filed at the request of the court.

The briefs have been carefully studied and considered.

The situation presented is unusual in the experience of this court in that the Primary Examiner in his statement made under Patent Office rule 135 failed to discuss or even refer to one substantial ground of rejection which he had previously applied in disposing of claims before him. Since the Act of March 2, 1929, 45 Stat. 1476, transferring to this court the jurisdiction in respect of appeals from the Patent Office in patent and trade-mark cases, we are unable to recall or find any record of a case in which the examiner's statement failed to refer in some way to each ground of rejection which he had applied in his final decision.

The here pertinent portion of rule 135 reads:

"135. Upon the filing of the appeal [to the Board of Appeals] the same shall be submitted to the primary examiner, who, if he find it to be regular in form, and to relate to an appealable action, shall within ten days from the filing thereof furnish the boards of appeals with a written statement of the grounds of his decision on *all* the points involved in the appeal * * *." (Italics ours.)

█ In view of the failure of the examiner to refer to the matter of double patenting in his statement the board might have been justified in concluding that he had abandoned that ground of rejection, but if it was of that opinion, there is nothing in its decision to indicate it. We may not lose sight of the fact that appeals from the examiner to the Board of Appeals is provided by *statute*, Sec. 4909, R.S., 35 U.S.C. § 57, 35 U.S.C.A. § 57, and rule 135 is a *rule of practice*, applicable after—and only after—an appeal has been taken. A failure on the part of the examiner fully to comply with the rule, therefore, may not properly be held to govern appeals to the board.

█ Whatever may have been the view of the board on the question of double patenting, if it had any view on the subject, it was not expressed in its decision. We are of opinion that there was sufficient in the record to elicit from the board, if its attention had been properly directed to it, a statement upon the subject. It should (had its attention been properly directed to it) at least have stated whether or not double patenting was an issue before it. We suppose that Patent Office practice would have permitted the board to remand (or whatever may be the Patent Office equivalent of "remand" as used in judicial proceedings) the examiner's statement with a request that it be made definite as to whether he (the examiner) did rely upon the ground of double patenting. However, in fairness to the board it should be emphasized that neither the brief of appellants before it, nor the statement of the examiner, contained anything which directed its attention to the question of double patenting.

582

So far as this court is concerned, we do not feel that it is within our province to pass upon a question concerning which so much doubt exists as to whether it really is an issue in the case. The statute, Sec. 4914, R.S. 35 U.S.C. § 62, 35 U.S.C.A. § 62, provides that, upon appeals taken from the decision of the board, this court "shall hear and determine such appeal, and revise the decision appealed from in a summary way * * *." This means, of course, that we shall revise if, in our opinion, revision be necessary, and it readily will be realized that we cannot determine whether we regard revision necessary unless we know what we are asked to revise.

There is enough in the record to indicate that the question of double patenting should be passed upon definitely, but it should be passed upon on its merits by the board before being considered on its merits by us.

Sustaining the motion on behalf of appellants to strike the reason of appeal hereinbefore described would probably have the effect (in view of our holding that claims 11, 12, 15, and 16 are not rejectable upon the prior art cited by the tribunals of the Patent Office) of a patent embracing those claims being issued to appellants and that might result in double patenting which would render the patent worthless.

For the reasons hereinbefore stated, we hold:

First, the rejection of claims 2, 5, 13, 14, 17, and 18 on the grounds of inadequate disclosure and indefiniteness is affirmed.

Second, the rejection of claims 11, 12, 15, and 16 on the prior art cited is reversed.

Third, the motion on behalf of appellants to strike reason of appeal No. 18, relating to double patenting, and the portions of the brief of the Solicitor for the Patent Office referring to that question, is denied, but the case is remanded to the Patent Office to the end that the Board of Appeals may determine (a) whether the question of double patenting is in the case and, if so (b) consider and decide that question.

Modified and remanded.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.